## GREIG & JONES v. RICE.

1. FRAUD.—DEED by A. to his brother-in-law, after attachment and suit by creditor; payment of money to A. before witnesses at an out-of-the-way place, away from his place of business, in large bills; execution of paper at that time not put in evidence or explained; execution of deed in absence of grantee and before he had agreed to its terms; grantee selling other property of A. under foreclosure; investment by A. of balance of purchase money in property for wife, creditors not being paid; and other facts tending to show knowledge by grantee of A.'s condition and participation by him in a fraudulent intent; held to be a fraud as to the creditors of A.

2. LEGAL ISSUES—EQUITABLE ISSUES—PRACTICE.—There is no rule prescribing which issue shall be first tried in a case in which both legal and equitable issues are raised, and the trial Judge may properly try that issue first which he thinks will dispose of the controversy.

3. SUBROGATION—FRAUD.—A grantee knowingly participating in the acts
of his grantor to defraud his creditors, is not entitled to be subro-
gated to the rights of mortgagee, and holders of judgments which
he paid out of purchase money, although taking assignments and
holding them open.

Before BUCHANAN, J., Bamberg, May, 1901.    Affirmed.

Action by Greig & Jones against William Brooks Rice, J.
B. Gillam, H. B. Grimes, A. J. Bennett, Fred Summers, and
James N. Wood.    From judgment for plaintiffs, defendants
appeal.

*Messrs. John R. Bellinger* and *Jas. F. Izlar,* for appellant.
The latter cites: *Issue as to legal title should have been first
tried:* Freeman on Ex., sec. 136 ; Wait Fraud. Con., secs. 59-
69 ; 14 Rich., 101 ; 33 S. C., 28 ; 38 S. C., 496.    *Fraud could
be raised against Rice deed on law side of Court:* 22 S. C.,
314 ; 1 Hill, 380 ; 9 Rich., 106 ; 14 Rich., 95 ; 34 S. C., 146 ;
35 S. C., 439 ; 39 S. C., 393.

*Messrs. Bellinger & Townsend,* contra, cite : *Purchaser at
execution sale may maintain an action to set aside a prior
fraudulent deed:* 22 S. C., 314 ; 34 S. C., 151 ; 2 Hill Ch.,
421 ; 33 S. C., 33 ; 5 Ency. P. & P., 406 ; Bliss on Code
Plead., 3 ed., sec. 115 ; 41 N. Y., 107 ; 12 S. E., 399 ; 6 Ves.,
182 ; 53 S. C., 236.    *Proceeding by execution and sale is not
an election to proceed at law here:* 13 L. R. A., 91.    *As to
mode of trial:* Bliss on Code Plead., sec. 163 ; 54 S. C., 155 ;
52 S. C., 578, 461 ; 30 S. C., 485.    *Sale can be referred to
judgment now held by grantee:* 49 S. C., 389 ; 46 S. C., 114.
*What may be in one case a badge of fraud is not in another:*
20 S. E., 665 ; 35 S. C., 431.

May 22, 1903.    The opinion of the Court was deliv-
ered by

MR. CHIEF JUSTICE POPE.    This extract taken from the
case of appeal will be here considered as being a history of

the action itself: "This action was commenced by service of the summons and complaint, July 31st, 1899, and the issues arising under the first cause of action were tried at the April, 1900, term of the Court of Common Pleas for Bamberg County, before the Honorable George W. Gage, presiding Judge, who rendered a decree in favor of the defendant, and refused the prayer of the complaint. This decree was filed May the 10th, 1900. From this decree and judgment entered thereon the plaintiffs appealed to the Supreme Court, and the case was docketed for hearing at the November, 1900, term of the Supreme Court; on the first day of the said term, the plaintiffs made a motion in the Supreme Court for an order suspending the said appeal, with leave to the appellants herein to move before the Circuit Court of Common Pleas for the county of Bamberg for a new trial upon the ground of after-discovered testimony, which motion was granted by the Supreme Court on the 30th day of November, 1900. At the December term of the Circuit Court for Bamberg County, the motion for a new trial on the ground of after-discovered testimony was made by the plaintiffs in the Court of Common Pleas for Bamberg County, and granted by Hon. R. C. Watts, presiding Judge. Pursuant to this order granting a new trial, the case came on to be heard at the April, 1901, term of said Court of Common Pleas before the Honorable O. W. Buchanan, presiding Judge. At the April term of Court, 1900, an order of discontinuance of the action as against the defendants, Joseph Carroll and Henry Zorn, was taken by consent, and they were thus eliminated from the record."

At the hearing before Judge Buchanan, the testimony was taken in open Court, being voluminous as offered by both sides to the controversy. Whereupon Judge Buchanan rendered the following decree:

"This is an action brought to set aside a conveyance as fraudulent, and for the possession of the property alleged to have been fraudulently conveyed. This case came on to be tried before Judge Gage, who found, from the evidence

produced before him, that the defendant had not been guilty
of any purpose to hinder, defeat or defraud the plaintiffs
herein. Upon appeal, the Supreme Court sent it back in
order that a motion for a new trial should be made on Cir-
cuit. This motion was heard before Judge Watts, who,
after hearing the evidence produced and after argument for
and against the motion, thinking the newly-discovered evi-
dence material, granted a new trial. It came before me at
the April term of the Bamberg Court, and the evidence, by
agreement, was taken in open Court before the Judge. Some
objection was sought to be made to the alleged improper
joinder of causes of action. But if it had been properly and
formally made as required by the Code, the cases of *Burch*
v. *Brantley,* 20 S. C., 503 ; and *McMahan* v. *Dawkins,* 23 S.
C., 320, showed joinder could be made as here set out.
Indeed, on page 320 of the latter case, the following is
found : 'The complaint contained two causes of action—the
first to set aside a deed of land for fraud, and the second to
recover possession of the land. The one is equitable and the
other legal. This, however, is not objectionable under the
reformed procedure. In fact, the union of these two actions
in the same complaint has been especially recognized as the
proper pleading, because it not only prevents circuity of
action, but affords prompt relief.' To the objection that this
joinder deprives the defendants of the right of a trial by a
jury, there may be replied the language of the same case :
'But when they are thus combined they do not lose their dis-
tinctive features and characteristics, nor are the rules hereto-
fore existing as to their trial changed or coalesced. On the
contrary, what was equitable before still remains equitable,
and what was legal is still legal, and the mode of trial is still
preserved. These rules require in this State that the first
cause of action should be tried by the Judge and the second
by the jury, unless a jury trial was waived.' This Court,
therefore, is now to decide the equitable issue. The defend-
ants, Wood and Rice, against whom fraud is alleged, are
residents of Georgia. The lands referred to as fraudulently

conveyed are situated in South Carolina.   The above parties answered and the issues are made up.   All men are presumed to be honest and faithful in their obligations to society, to speak the truth and to do no fraud.   'Fraud is odious and not to be presumed.'   If there had been no presumption upon the subject, the reputation heretofore borne by Wood and Rice would cause the investigator to look closely and examine sharply into these charges against them; but if it be recalled that it is the act itself that makes one honest or guilty and not what people think of it, the burden of a guilty act must fall upon the person who does it and not upon others.   In spite of all these presumptions, it is as well established as evidence can make it that James Wood, being insolvent, for the purpose of hindering, delaying and defeating the debts of the plaintiffs herein, made the conveyance herein attacked to his brother-in-law, William Brooks Rice, who knew, or ought to have known, what he was doing when he accepted the deed from Wood (made without his knowledge, if the statement is to be relied upon), before agreement as to the price or payment of money.   And it does not make it any less because he refused to agree to reconvey the land to Wood when Wood again got into good circumstances.   Nor that he was surprised by it.   To hold that Wood and Rice were not acting together presupposes a wonderful mental obfuscation and stupidity.   What did Wood mean when he told Jones practically that he would see that he did not get the South Carolina lands?   For what purpose did Wood and Rice ostentatiously go through the form of counting out that amount of money in the presence of witnesses in that country store and of having no witnesses in the hotel in Savannah?   Truly the wisdom of the Supreme Court in sending this case back and that of Judge Watts in granting a new trial is amply vindicated by the evidence here adduced.   Can any sane man doubt what Wood intended?   Who but an idiot would conclude that Rice did not know what Wood meant?   True, they lived about a hundred miles apart—but did that keep them from knowing

what concerned the other?   Were they not brothers-in-law? Is it not fair to assume that there was the usual correspondence and communication between relatives? They were business men, and not idiots or irresponsibles.   I yield to no one a higher idea or estimate of human nature.   But because of such an idea or estimate of humanity I will not shut my eyes to the exceptions when I see them.   I do not propose to stultify myself by saying I do not see what is thrust upon me from every standpoint or view point of the case here presented.   Who ever expects men who intend to defeat their creditors to put such intention down in writing and send it to the creditors or advertise it to the world?   What might be a badge of fraud in one case might not be evidence of fraud in another case.   It is by taking the case (and all its parts together) and examining the evidence as other cases are examined, that a decision must be made and fraud or proper conduct found.   On the 5th day of August, 1895, Coskery and Davidson began an action against James N. Wood, and an attachment was issued against the lands of James N. Wood and notice of *lis pendens* filed.   The land was attached.   On the 10th October, 1895, Greig & Jones, the plaintiffs herein, commenced an action against Jas. N. Wood and B. J. Robertson, copartners in trade under firm name of Wood & Co. and Robertson, Wood & Co. and caused a warrant of attachment to be issued against the lands of James N. Wood, which said lands were attached.   The above debt of Coskery & Davidson was for the sum of $645.85 (judgment).   The amount of the judgment recovered by Greig & Jones was $14,457.42.   Now, while the attachment suit of Coskery & Davidson was actually in existence (having been commenced on 5th August, 1895), the defendant, James N. Wood, conveyed all his visible real estate to his brother-in-law, William Brooks Rice.   After the conversation, and probably to effectuate the threat as to the Carolina property mentioned by Wood to Jones, this deed of the same Carolina property, alleged to have been made on the 27th September, 1895, just five days after the

commencement of the suit by Greig and Jones, finds its way to the register of mesne conveyance for Barnwell County. It is not clear when it was delivered.    In the absence of evidence to the contrary, it is presumed to have been delivered on the day of its date.    Afterwards judgment was entered on verdict of jury before Judge Watts for the sum of $14,457 and 42-100.    This judgment for Greig and Jones was rendered on 18 March, 1898.    The judgment for Coskery & Davidson amounted to $645 and 81-100, and was rendered on 20th day of November, 1897.    These lands were advertised by the sheriff, put up and sold, and were bought in by the plaintiffs for the sum of $350.    The parties in possession refused to give possession to plaintiffs.    The plaintiffs having now exhausted their attempts to make their judgment, brought this action.    I think there was a valid lien created by Coskery & Davidson attachment, and the sale could be referred to such judgment.    The purchaser would stand in the shoes of the interest sold.    There is no doubt as to the plaintiffs here being the purchasers.    There is no doubt that the execution and judgment are not satisfied. Can there be any doubt that Rice had actual notice of the attachment of Jones and Greig against Wood, at the time that he is said to have paid the money to Wood?    Will the law not say that Rice had notice of the claim of the plaintiffs herein by reason of the attachment and filing of the *lis pendens* before he paid the money?    I am not at all satisfied that there was any actual delivery of the deed of Wood to Rice until after the attachment of Greig and Jones.    The defendants take this burden upon themselves.    I am not satisfied that there was such a delivery before the 10th day of October.    Hon. S. G. Mayfield says it was signed on 27th September, 1895, under instructions from Wood.    Mr. Wood took it off with him.    It afterwards came back to Mr. Mayfield on the 14th October, and was by him sent to the register of mesne conveyances for Barnwell County and was by him recorded.    Mr. Jones testified to the conversation with Wood about a month before certain notes (which were

12—66

to mature October 1st) fell due, or within three weeks before suit was brought, in which he said: 'Mr. Wood told me that he would not pay them—that I couldn't make him pay them. He said that his property in Georgia had been mortgaged and out of his possession, and then I referred to the Carolina property. I told him, "Mr. Wood, that Carolina property is certainly subject to any debt." He said that it was not and I said, 'you will see whether or not it is.' " Doubtless from the testimony of Mr. Mayfield soon after this conversation, he sent instructions to have the deed drawn up leaving the date blank, taking the deed back with him to Savannah or his home, all information and details necessary for the project were given and prepared. The deed was then returned to be delivered or recorded; Rice says the deed was given him by Wood when in Savannah, and was kept by him until the 12th October, when his brother, S. P. Rice, sent it to Mr. Mayfield to be recorded. When did Wood give it to Rice—a day or so before he returned it to Mr. Mayfield, or immediately upon Mr. Wood's return to Carolina? Wood was evidently determined that the Carolina property should not answer for his debts. This was about all the property he owned at the time. In this connection it is well enough to note that neither Wood nor Rice considered the trade to be closed and completed; for if Rice is to be believed, while in Savannah, Wood wanted him to agree to reconvey the lands when his affairs got in a better condition, but he refused to agree to let him redeem them. 'You first say that Mr. Wood first wanted you to take the land, and when he made this settlement with Greig, Jones & Co., to let him redeem the property?' 'Yes.' 'And you declined to do it?' 'Yes; he said, when he got in a condition.' True, Rice tries to locate the delivery and acceptance of the deed on the 28th òr 30th day of September, but this testimony is very unsatisfactory. How can Rice, who accepts a deed of land under an attachment lien with the knowledge from Wood that he desired to convey his land to him (Rice) until the Greig & Jones matter is settled, claim to be a *bona fide* purchaser of such land

under these circumstances? Surely a court must be very bold that would hold him to be a *bona fide* purchaser under such circumstances. Can it be said that at that time he thought Wood was solvent, when Wood was practically asking him to help him defeat his creditors and offering him a deed of the only lands he had? True, at one time he had been worth, or thought to have been worth, something like $75,000. Rice knew Wood was worth no such sum at the time of the talk in Savannah. I do not doubt the testimony of those witnesses who said Wood was at one time reputed to be wealthy. From what I can gather from the testimony, this statement is true. But Wood and Rice both knew Wood was insolvent at this time, and Rice took this land under these circumstances. I need scarcely allude to the payment of the unusual amount of money in $50 or $100 bills at Stilson, in the presence of witnesses, when a check or a draft would have sufficed if it was a fair transaction, and to the payment of the money back to Rice by Wood in Savannah, further than to call attention to the signing of some instrument at the Stilson store at the time of the counting out of the money, which instrument has not been fully and properly accounted for in this action. I find as a matter of fact, that Wood intended to hinder or defeat the claims of these creditors. I find that after telling Mr. Jones practically that he would see that the Carolina lands would not be liable for his debt, he instructed Mr. Mayfield to have drawn up the deed which was signed; that before it was signed by him he was told flatly by Mr. Mayfield that he would have nothing to do with drawing or signing a deed that would deprive his clients (Mrs. Wilie Wood and her children) of their rights or serve the effect of defeating their debt. He knew he was insolvent, and was trying to save something from the wreck—knew of the attempt to make the money. He proposed to a near relative to become the custodian of the title of all his property until his difficulties were safely tided over; actually sells out to his brother-in-law, and realizes every dollar there is in it for himself, and pays nobody except

the creditors secured by mortgage on the property; leaves the available proceeds of the sale in the hands of a purchaser without interest or security until it can be covered into his wife's name, and that wife the sister of the purchaser. Rice, in my judgment, knew of the whole circumstances. Rice is no ordinary man—he is a man of ability. Rice, of course, knew Wood's property was attached. He knew of Coskery and Davidson's proceedings. He knew of the Peacock, Hunt & Co. claim or mortgage of about $6,000. He knew Wood was involved with Greig and Jones for a large sum. He is asked by Wood to hold the property from his creditors until he could arrange his affairs, until his difficulties were over. Wood was insolvent and the plaintiffs' debt is yet unsatisfied. To require more than has been proven in this case would be equivalent to saying that such transactions are entitled to and will receive complete immunity at the hands of the courts. I, therefore, think this deed was given in violation of the law, and hold as matter of law it was intended to hinder and defeat creditors (and the creditors plaintiffs herein), and at the time Rice received the deed, he knew of the purpose, and is not a *bona fide* purchaser of the land, and that it should be set aside.

"Wherefore, it is ordered and decreed, that the said deed is null and void as against the plaintiffs herein, and is set aside as of no effect for the reasons hereinbefore set out. This disposes of the equitable issue. The issue for a jury will be tried before a jury.".

To which the defendants made the following grounds of appeal, to wit:

"1. Because his Honor, the Circuit Judge, erred in finding that at the trial 'Some objection was sought to be made to the alleged improper joinder of causes of action,' no such objection having been raised; whereas, he should have found that the defendants objected at the trial to the hearing by the Court of the equitable issues raised by the first cause of action alleged in the complaint, and insisted that under the facts alleged in the complaint, the plaintiffs were confined to

the second cause of action for the recovery of the possession
of real property, and on legal issues raised by the said second
cause of action the defendants were entitled to a trial by
jury.

"2. Because his Honor, the Circuit Judge, erred. in hold-
ing that the present action and the objection raised at the trial
were ruled by the principles laid down in *Burch* v. *Brantley,*
20 S. C., 503, and *McMahan* v. *Dawkins,* 23 S. C., 320,
and especially by what was said by the Court in the latter
case; whereas, he should have held that the objection raised
at the trial was not one as to the improper joinder of causes
of action, but whether or not the plaintiffs having ignored
the deed of conveyances from Wood to Rice of the real
property in question as fraudulent and void, and having
caused the said real property to be levied upon by the sheriff
and sold under the execution issued upon their said judg-
ment; and having at said sheriff's sale become the purchasers
of said property; and having paid their bid and taken
sheriff's title thereto, were not, under these alleged facts and
circumstances, confined to their legal cause of action for the
recovery of the possession of real property, and the defend-
ants entitled to a jury trial on the issues raised by the legal
cause of action; and that such being the case, the principles
laid down in the cases of *Burch* v. *Brantley, supra,* and
*McMahan* v. *Dawkins, supra,* did not apply; and that under
the facts alleged, the objection of the defendants should be
sustained, and their motion for a trial by jury should on the
legal cause of action prevail.

"3. Because his Honor, the Circuit Judge, erred in hold-
ing that under the facts and circumstances of this case as set
forth in the plaintiffs' complaint, that the equitable issues
raised by the first cause of action should be *first* tried by the
Court; and in refusing to sustain the objections of the de-
fendants, or to allow a trial by jury, as demanded on the
legal cause of action stated in the complaint, and in proceed-
ing to first hear and determine the equitable cause of action
alleged in the complaint.

"4. Because his Honor, the Circuit Judge, erred in holding that the sheriff's sale of the real property in question under the execution issued upon the judgment of the plaintiffs against Wood, could be referred to the Coskery and Davidson judgment, by reason of the fact that 'there was a valid lien created by the Coskery and Davidson attachment.'

"5. Because his Honor, the Circuit Judge, erred in holding 'that Rice had actual notice of the attachment of Greig and Jones against Wood at the time he is said to have paid the money to Wood;' whereas, he should have held that, from all the facts and circumstances, Rice had no such notice, and paid the purchase price of the real property in dispute to Wood, believing that he was getting a valid title thereto, and that there was no lien by way of attachment upon the same, save that of Coskery and Davidson, which was afterwards, and before the attachment of the plaintiffs, discharged by Rice's paying and satisfying the judgment of Coskery and Davidson.

"6. Because his Honor, the Circuit Judge, erred in finding that there was no actual delivery of the deed of conveyance from Wood to Rice of the land in dispute, before the 10th day of October, 1895; whereas, he should have found from the uncontradicted testimony in the cause, and from all the facts and circumstances, that said deed of conveyance was actually delivered, and the purchase price of said land, as agreed on by the parties, paid by the defendant, Rice, before the levy of the attachment in the case of Greig & Jones *v.* Wood.

"7. Because his Honor, the Circuit Judge, erred in holding as follows: 'In this connection' (delivery and recording of the deed), 'it is well enough to note that neither Wood nor Rice considered the trade to be closed and completed; for if Rice is to be believed, while in Savannah, Wood wanted him to agree to reconvey the lands when his affairs got in better condition, but he refused to agree to let him redeem them. "You first say that Mr. Wood first wanted you to take the land, and when he made his settlement with

Greig & Jones to let him redeem the property?" "Yes." "And you declined to do it?" "Yes; he said when he got in condition." True, Rice tries to locate the delivery and acceptance of the deed on the 28th or 30th day of September, but this testimony is very unsatisfactory. How can Rice, who accepts a deed of land under an attachment lien with the knowledge from Wood that he desired to convey this land to him (Rice) until the Greig & Jones matter is settled, claim to be a *bona fide* purchaser of such land under these circumstances? Surely, a court must be very bold that would hold him to be a *bona fide* purchaser under such circumstances? Can it be said that at that time he thought Wood was solvent, when Wood was practically asking him to help him defeat his creditors, and offering him a deed of the only lands he had?' Whereas, he should have held from the testimony that the deed from Wood to Rice of the lands in dispute was actually delivered and accepted by Rice on the day that Wood's wife renounced her dower upon the deed in the city of Savannah; that the purchase of the land and the delivery of the deed were without any condition or secret understanding between the parties whatsoever; that at that time Rice had no knowledge of the insolvency of Wood, or of his intent to defeat the debt of the plaintiffs or other of his creditors; that he paid the purchase price agreed, believing that he was getting a good and valid title to said lands, free from all incumbrances save the Coskery and Davidson judgment; that when he took the deed and paid the purchase price of said lands, he considered the transaction closed and completed; and that Rice, not having notice of the insolvency of Wood, or of any intent on Wood's part to delay, hinder and defraud his creditors, before accepting the deed and paying the purchase price of the lands, or of any facts calculated to put him (Rice) upon the inquiry, could occupy the position of a *bona fide* purchaser for value without notice, and was, therefore, protected as such purchaser.

"8. Because his Honor, the Circuit Judge, erred in holding and deciding that, under the facts and circumstances of

this case, Rice could not occupy the position of a *bona fide* purchaser for valuable consideration without notice; and that he had notice of the insolvency of Wood at the time of the purchase of the said lands from Wood and the payment of the purchase price therefor; and of the intent of Wood to defeat and defraud his creditors, by conveying away said lands.

"9. Because his Honor, the Circuit Judge, erred in holding that 'In spite of all the presumptions, it is as well established as evidence can make it that James N. Wood being insolvent, for the purpose of hindering, delaying and defeating the debt of the plaintiffs herein, made the conveyance herein attacked to his brother-in-law, William Brooks Rice, who knew, or ought to have known, what he was doing when he accepted a deed from Wood (made without his knowledge, if his statement is to be relied upon), before agreement as to price or payment of money; and it does not make it any the less because he refused to agree to reconvey the land to Wood when Wood again got into good circumstances. Nor that he was surprised by it.' Whereas, he should have held, from the evidence before him, that Rice was ignorant at the time of the conveyance and of paying the purchase price of the land, of Wood's insolvency, and the conveyance being made by Wood with intent to delay, hinder and defeat the debt of the plaintiffs, or other of Wood's creditors; and that there was nothing in the facts and circumstances sufficient to put Rice upon the inquiry that Rice was, also, ignorant of what had passed between Jones and Wood as to the indebtedness of Wood to Greig and Jones, and as to the Carolina lands.

"10. Because his Honor, the Circuit Judge, erred in holding and concluding as matter of law, that the deed of Wood to Rice 'was given in violation of the law,' and 'was intended to hinder and defeat creditors (and the creditors plaintiffs herein), and that at the time Rice received said deed, he knew the purpose, and is not a *bona fide* purchaser of the land, and that it should be set aside.'

"11. Because his Honor, the Circuit Judge, erred in ordering, adjudging and declaring that said deed 'is null and void as against the plaintiffs herein,' and in setting the same 'aside as of no effect,' for the reasons set out by him in said decree, or for any or either of them.

"12. Because his Honor erred in holding that Wood told Jones that he would see that he did not get the Carolina lands, no such statement having been made.

"13. Because his Honor erred in holding, 'Who but an idiot would conclude that Rice did not know what Wood meant? True, they lived about a hundred miles apart, but that did not keep them from knowing what concerned the other. Were they not brothers-in-law? Is it not fair to assume there was the usual correspondence and communication between relatives?' Whereas, the testimony shows that there was no such correspondence and communication, and Rice swore positively that he did not know Wood's circumstances and believed him solvent, and had had no communication with him; and against such testimony it could not be *assumed* that there was correspondence and communication between them, especially for the purpose of *presuming* fraud, which his Honor finds must be *proved,* not *presumed.*

"14. Because his Honor erred in virtually holding that it was a fraud, for which Rice should be held responsible, for Wood to have conveyed his property to Rice while the attachment of Coskery and Davidson was pending; whereas, he should have held it could not be a fraud, since part of the purchase price was to go in payment of this very attachment, and was actually so paid.

"15. Because his Honor erred in holding that Rice had notice of the attachment of Greig & Jones against Wood when he paid the purchase money; whereas, he should have held that the larger part of the purchase money was paid before such attachment was levied, and that no notice of it was had by Rice before he paid the balance.

"16. Because his Honor erred in not holding that the deed was delivered to Rice before the attachment of Greig & Jones

was levied, because, as he found, the legal presumption was that it was delivered at its date; and the only testimony against this presumption was that of Rice and Wood, who swore that it was delivered in Savannah on September 28th, which was twelve days before the attachment.

"17. Because his Honor erred in holding that Wood was practically asking Rice, at the time he made the deed, to help him defeat his creditors, the testimony admitting of no such construction.

"18. Because his Honor erred in holding that Rice at that time knew that Wood was insolvent; whereas, the testimony shows that he had no such knowledge.

"19. Because his Honor erred in holding that Rice knew that Wood was at the time involved with Greig & Jones in a large sum; whereas, he should have found that at that time Wood had informed Rice that upon a settlement between him and Greig & Jones, they would owe him at least $15,000, and he believed this statement, and there was nothing to put him on inquiry, and the proceedings by Greig & Jones had not been instituted.

"20. Because his Honor erred in holding that Rice was asked by Wood, 'to hold the property from his creditors until he could arrange his affairs, until his difficulties were over,' the testimony not warranting any such conclusion.

"21. Because, even if *Wood* did intend by this transaction to defraud his creditors, the testimony shows that Rice had no knowledge of such intent, and that *he* acted honestly in the matter; and if so, however fraudulently *Wood* might have acted, *his* fraud could not have vitiated the deed as to Rice, and he should have been protected in his purchase.

"22. Because, in any event, Rice having acted fairly, should be protected to the extent of the Coskery and Davidson judgment and the Peacock, Hunt & Co. mortgage, which sums were certainly paid by him in extinguishment of liens on the lands as a *bona fide* transaction, liens superior to that of Greig & Jones, and he should at least be subrogated to the rights of those lien creditors, even if he should be held not to

be a *bona fide* purchaser as to the payment of the other $4,000, which it is claimed he paid after he had notice of the Greig & Jones attachment.

"23. Because the Coskery & Davidson judgment and the mortgage were liens superior to the attachment of the plaintiffs, and having been taken up by Rice and assigned to him and kept open, in what at the time he believed to be an honest transaction, he should be protected, at least, to the extent of such liens.

"24. Because the equity of Rice, at least, to the extent of the said judgment and mortgage, is superior to the equity of the plaintiffs under a subsequent attachment and judgment, and his legal title should therefore prevail.

"25. Because, even if Rice did have notice of the attachment of Greig & Jones when he paid the $4,000, yet that was after his purchase and after the deed had been made and delivered; and whatever effect such knowledge might have on that payment, it could not affect the deed itself or the sale of the land, as they must be judged by the facts as they existed in the mind of Rice at the time of the purchase and the delivery of the deed.

"26. Because the transaction was complete at the time of the delivery of the deed, Rice giving his note for the credit portion of the purchase money; and his subsequent payment of said note, even with the knowledge of the Greig & Jones attachment, could not relate back to the original transaction so as to make it fraudulent, when at the time it was entered into it was free from fraud.

"27. Because the payment of the $4,000 was not a fraud upon the creditors of Wood, but was a payment of Rice's note to Wood, and was made in accordance with the terms of the agreement made when the land was conveyed.

"28. Because, when said payment was made, Rice had no *actual* notice of the attachment of Greig & Jones, and, it having been levied *after* his purchase, he was not affected by constructive notice of it.

"29. Because his Honor erred in not holding that Fred

Summers was a *bona fide* purchaser for value without notice of any alleged fraud, and in not dismissing the complaint as to him.

"30. Because the question of delivery of the deed from Wood to Rice at its date is not put in issue by the pleadings, the complaint itself alleging delivery.

"31. Because the attachment and judgment of Greig & Jones, having been levied on the lands when the legal title to them was in Rice under a *bona fide* sale, constituted no liens on said lands, and gave plaintiffs no rights as against said lands."

Before considering the exceptions *seriatim,* our own views and conclusions might be independently stated: That the defendant, James N. Wood, intended by making the deed to land lying in Barnwell County, some 700 acres, to his codefendant, William Brooks Rice, in order to hinder, defraud and delay the collection of the debts held by his creditors, admits of no doubt. The conversation that he held with Mr. Jones, of the firm of Greig & Jones, merchants in Savannah, shows a purpose on his part to defeat the rights of his creditors to appropriate under legal proceedings these lands to the payment of his debts. His haste, on the 27th September, 1896, to execute a deed to said lands without the knowledge or consent and in the absence of the grantee, William Brooks Rice, at a price which had not been agreed on between them, is another matter of evidence of such purpose. Together with the application by himself, as even he tells his story, of the sum of $4,000 of such proceeds of the sale from his codefendant, William Brooks Rice, to the purchase of a railway bid off by his wife, Mrs. E. E. Wood, whose agent alone he admitted himself to have been, is another strong circumstance against him. In addition to these, some other matters of evidence will be referred to hereafter. Thus it is demonstrated that his (Wood's) plans and purposes and conduct were opposed to every principle of equity. It is admitted that if he had made sale of his lands to his codefendant, William Brooks Rice, with-

out any intention on the part of Rice to participate in this fraud, without any knowledge of the circumstances of this insolvency, and with no purpose to participate himself in Wood's determination to defraud his creditors, William Brooks Rice might be absolved from all the consequences of J. N. Wood's frauds. Still our minds are drifting to the conclusion that William Brooks Rice participated by a guilty knowledge in Wood's fraud and a participation in all the frauds perpetrated by his codefendant, J. N. Wood. Attention is called again to the fact that William Brooks Rice was not present when the deed was made, did not agree that such deed should be made; that while the deed was made in Barnwell County, on the 27th day of September, 1896, William Brooks Rice was not notified then of its preparation and execution until the 28th day of November, 1896, while in the city of Savannah, Georgia. These circumstances in themselves require great credulity for their acceptance. Mr. William Brooks Rice himself testifies that when his codefendant, J. N. Wood, first unfolded his scheme to sell him these lands, he had not agreed to the plans named in the deed. That William Brooks Rice did draw from the naval stores company in Savannah, Georgia, the sum of $5,000 on the 28th day of September, 1896, there is no doubt. He did not pay said sum to J. N. Wood, on the 29th September, 1896; but in company with Wood repaired to the house of the latter, some forty-five miles distant, at a little place called Woodbourne, where Wood resided, where William Brooks Rice obtained, without consideration, the satisfaction of a mortgage held by his half-sister, Mrs. E. E. Wood, to secure several thousand dollars owed to Mrs. Wood by her husband, J. N. Wood; while holding the deed executed to him by said J. N. Wood, he (Rice) proposed to pay the said sum of $5,000 to Wood, and for that purpose both parties, Wood and Rice, went a distance of four miles to the store of one Mr. Strickland, where, in the presence of said J. W. Strickland and J. E. Browne, the $5,000 was counted by them, and the paper of several pages, which J. N. Wood signed in

the presence of witnesses, which said paper so signed by Wood, *after Rice had paid Wood* the said $5,000, was handed by said Wood to the said Rice, and *which said paper Mr. Rice put in his pocket.* The witnesses are positive that Wood had signed this paper because Rice paid the $5,000 to Wood; and Wood afterwards spoke to these two witnesses about coming to South Carolina, as witnesses to the paper that was signed at the store at that time. Rice and Wood in their testimony both admitted the payment of this $5,000; but they deny that the execution of this paper had any connection with the payment of the money. It is a significant circumstance that neither Wood nor Rice have ever produced this paper or given any explanation of the contents thereof. We are obliged to lay stress upon these circumstances. It was their duty to have explained what was in this paper executed by Wood before the payment of this money. Again, when they go to Savannah, the next day, Wood claimed to have repaid to Rice this $5,000 in the Screven House, in said city of Savannah, without any witnesses thereto. Afterwards Rice claims to have paid over $6,000 to Peacock, Hunt & Co., who had a mortgage on the Barnwell lands for that amount. Stress should be given to the fact that Wood's wife was a half-sister of W. B. Rice; that their relations were cordial; yet Rice denies that he had any knowledge of the insolvency of Wood, although he had a few months before had all his property in the State of Georgia sold under the foreclosure of a mortgage over property of Wood's in the State of Georgia. Yet Rice claims not to have known anything of the circumstances. The use by Wood of the $4,000 in connection with the purchase by his wife of a small railroad, was well known by William Brooks Rice, and this $4,000 was a part of the purchase money of the Barnwell lands, as Wood and Rice testify. We might go forward and multiply items from the testimony which militates against the want of knowledge by Rice of the condition of his brother-in-law, Wood, but we will not cumber

the record by doing so.    We will now pass upon these exceptions *seriatim:*     ·

1. We find no serious error in the Circuit Judge's decree, as complained of in the first exception, because it is evident from an inspection of the complaint itself that the trial of the equitable issue should have preceded the trial of the law issue.    There is no fixed rule as to what issue shall be first tried, where both legal and equitable issues are set out in the complaint as distinct causes of action. Surely in this case it would have been unwise in the Circuit Judge to have tried a law issue involving the title to these lands, and then afterwards have tried the equitable issue, which, if successful, would have rendered nugatory all of the labor and expense involved in the trial of the legal issue. This exception is overruled.

2. Nor do we find that the Circuit Judge was in error as complained of in the second exception, because we could not see that there was any law in this State for a plaintiff to abandon the field of battle chosen by himself in order to foster the preferences of defendant.    If the plaintiff had a right to the trial of this equitable issue, and the Circuit Judge so thought, there was no error in refusing to try the second issue, which is the legal issue.

3. For the same reason as above set forth, we overrule the third issue.

4. We do not conceive that the matter referred to in the fourth question was of any consequence, because what lien was acquired by the Coskery and Davidson attachment was of no consequence.    The Court below and this Court are truly anxious in discovering what part Wood and what part Rice took each for himself in the sale by Wood and Rice of the Barnwell lands.    We would not allow ourselves to jeopardize the good name of William Brooks Rice by what in law and equity he might have known under these attachment proceedings alone.    This exception is overruled.

5. We do not think the Circuit Judge erred in holding

as he did, as set out in this exception. A study of the testimony convinces us that Rice allowed himself, because of his interest in his sister and her husband, to become involved in the fraudulent conduct of the said J. N. Wood. This exception is overruled.

6. We think there is no vitality in this sixth exception, because it makes no difference in our view whether this deed was delivered on the 29th of September, 1896, or the 10th day of October, 1896. It certainly was delivered at some such date. Our conviction as to the result of this investigation hinges not upon the date of the delivery but rather *the purpose* of the parties to the deed in its execution. This exception is overruled.

7. We see no error in the expression used by the Circuit Judge in his decree, as complained of in the seventh exception. We do not think that the wife's renunciation of dower plays any part in the acceptance of the deed by Rice. This exception is overruled.

8. From a careful study of the testimony in this case we must say that the holding of the Circuit Judge, as complained of in the eighth exception, is abundantly supported. This exception is overruled.

9. And for the same reflection set out under No. 8, we hold that the Judge did not err, as complained of in the ninth exception. This exception is overruled.

10. Nor do we feel from a study of the testimony that the Circuit Judge erred, as complained of in the tenth exception. This exception is overruled.

11. This exception is too general to require any notice from us except to announce that it is overruled.

12. It is quite true, as alleged in the twelfth exception, that Wood did not tell Jones that he would see that he did not get the Carolina lands, yet he did say that such lands were not liable to the payment of the plaintiff's debts. His exact language in answer to the witness, Jones, was: "If you sue, I'll put you to as much trouble as possible before you ever get it." Again, Jones said in his testimony: "I told

him, Mr. Wood, that Carolina property is subject to any debt; you said that it was not, and I said you will see whether or not it is." And this conversation occurred before suit was brought, 10th of October, 1896. This exception is . overruled.

13. We do not think that the Circuit Judge erred at all, except, possibly, his language may have been a little too strong; as we have before said, we are deeply impressed and regretfully so that William Brooks Rice participated fully . in the misconduct of J. N. Wood. This exception is overruled.

14. We see no reversible error here; for, even granting that the expression of the Circuit Judge was erroneous, it played no part really in his conclusions. This exception is overruled.

15, 16, 17, 18, 19, 20 and 21. In our previous consideration of the subject matter of this controversy, as the testimony relates to the same, we have announced our conclusions · that the defendant, William Brooks Rice, participated in the wrong to the plaintiff knowingly and intentionally, and, therefore, these exceptions are overruled.

22. We cannot take the view of the appellants as set out in the twenty-second exception. While we still hold, and do hold, that these defendants have wronged the plaintiff, so that the deed executed on the 27th of September, 1896, should be set aside as null and void, we cannot subrogate Rice in any rights that Peacock, Hunter & Co. or that Coskery & Davidson had under their judgment; he must take the usual portion of the person dealing in fraud. This exception is overruled.

23 and 24. For the reasons given under exception No. 22, we cannot sustain these two exceptions, and they are, therefore, overruled.

25, 26, 27 and 28. These several exceptions just named must be overruled, because they are utterly inconsistent with the conclusions heretofore announced by us.

13—66

29. We see no error here complained of, and it is, therefore, overruled.

30. These exceptions really involve no merits, because it plays no part in the conclusion at which we have arrived.

31. Nor do we think there is anything in this exception; it is overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.